**No. 26-1628**

---

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE SEVENTH CIRCUIT**

---

CHARLES GREENWOOD, Individually and on Behalf of All Others Similarly Situated,

*Plaintiff-Appellee,*

v.

EXPRESS TECHNOLOGIES LTD.,

*Defendant-Appellant,*

On Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division
No. 1:25-cv-08121
Hon. Jorge Alonso Presiding

---

# BRIEF OF THE PLAINTIFF-APPELLEE, CHARLES GREENWOOD

---

**WITTELS MCINTURFF PALIKOVIC**
Jessica L. Hunter
305 BROADWAY, 7TH FLOOR
NEW YORK, NEW YORK 10007
Telephone: (914) 775-8862
jlh@wittelslaw.com

*Counsel for Plaintiff-Appellee, Charles Greenwood*

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 26-1628

Short Caption: Greenwood v. Express Technologies Ltd.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
Charles Greenwood

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
Wittels McInturff Palikovic

(3) If the party, amicus or intervenor is a corporation:

i) Identify all its parent corporations, if any; and

N/A

ii) list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

N/A

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

---

Attorney's Signature: /s/ Jessica L. Hunter Date: April 10, 2026

Attorney's Printed Name: Jessica L. Hunter

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes** ☑ **No** ☐

Address: 305 Broadway, Floor 7
New York, NY 10007

Phone Number: (914) 775-8862 x110 Fax Number: (914) 775-8862

E-Mail Address: jlh@wittelslaw.com

rev. 12/19 AK

**TABLE OF CONTENTS**


INTRODUCTION ............................................................ 1

JURISDICTIONAL STATEMENT ............................................................ 3

STATEMENT OF THE ISSUES ............................................................ 3

STATEMENT OF THE CASE ............................................................ 4

I. FACTUAL BACKGROUND ............................................................ 4

II. PROCEDURAL BACKGROUND ............................................................ 6

SUMMARY OF ARGUMENT ............................................................ 7

ARGUMENT ............................................................ 13

I. EXPRESSVPN WAIVED THE FIRST TWO ISSUES RAISED BY ITS APPEAL ....... 13

A. ExpressVPN Waived Its Argument That Plaintiff Failed to Offer Evidence of Assent to the September 2022 Terms ............................................................ 13

1. The Assent Argument Was Never Presented to the District Court ........... 14

2. ExpressVPN Possesses (And Has Produced) the Very Evidence It Now Claims Is Absent from the Record. ............................................................ 16

3. ExpressVPN's Reply Argument Addressing "Continued Use" Reflects an Implicit Concession That Plaintiff Did Interact with the Platform After September 2022. ............................................................ 17

4. ExpressVPN Waived Any Evidentiary Objection in the District Court as to Whether Plaintiff Used ExpressVPN's Site or App After the September 2022 Terms Were Posted. ............................................................ 19

5. Any Subsequent Argument Seeking to Broaden ExpressVPN's Bases of Appeal Is Also Waived. ............................................................ 20

B. ExpressVPN Waived Its Argument That the May 2022 Arbitration Clause Cannot Be Extinguished Absent "Clear and Specific Waiver." ............................................................ 21

II. REGARDLESS OF EXPRESSVPN'S WAIVER OF APPELLATE ISSUES, THE DISTRICT COURT SHOULD BE AFFIRMED. .................................................. 22

A. Under the May 2022 Terms' Unilateral Modification Clause, Plaintiff Was Not Required to Take Any Action to Bind ExpressVPN to the September 2022 Terms. .................................................................................................. 23

1. Unilateral Modification Clauses Are Permissible in Illinois and Modifications Made Pursuant to Such Clauses Take Effect Without Separate Acceptance. .......................................................................... 24

2. ExpressVPN's May 2022 Terms Authorized Defendant to Make Unilateral Modifications Without Notice That Became Effective Once Posted to Its Website. ............................................................... 27

3. ExpressVPN Cannot Invoke Its Unilateral Modification Right to Post the September 2022 Terms and Then Disclaim Those Terms When They Are Invoked Against It. ............................................... 29

B. ExpressVPN Failed to Establish a Valid Arbitration Agreement, but to the Extent Disputes Regarding the Existence of a Valid Agreement Remain, the Case Should Be Remanded for Further Fact Development. .............. 32

C. ExpressVPN's September 2022 Terms Terminated Plaintiff's Arbitration Agreement: No "Clear And Specific Waiver" Was Needed, and the Forum-Selection Clause Is Clear and Specific. ......................................................... 35

1. The Presumption of Arbitrability, Which Concerns the Scope of an Arbitration Agreement, Does Not Apply Here. ........................................... 35

2. The September 2022 Terms Superseded the May 2022 Terms in Their Entirety. ........................................................................................... 37

3. The Seventh Circuit Has Not Adopted a "Clear and Specific" Waiver Rule Regarding the Supersession of Arbitration Clauses. ........................... 40

a. ExpressVPN's Out-of-Circuit "Clear and Specific Waiver" Rule Is Derived from the Inapplicable Presumption of Arbitrability. .............. 41

b. Courts Have Expressly Rejected the "Clear and Specific Waiver" Requirement ExpressVPN Seeks to Impose Here and ExpressVPN's Contrary Authority Is Inapplicable. ................................ 43

4. Even Assuming a "Clear and Specific Waiver" of the May 2022 Terms' Arbitration Agreement Were Required, the September 2022 Terms' Forum-Selection Clause Does Just That. .......................................... 45

III. EXPRESSVPN'S THIRD AND FINAL APPELLATE ISSUE ALSO FAILS BECAUSE DELEGATION IS NOT APPROPRIATE WHERE THE ARBITRATION AGREEMENT HAS BEEN TERMINATED. .................................... 47

IV. THE *MILLAR* COURT DID NOT DECIDE THE ISSUE PRESENTED HERE.......... 50

CONCLUSION ........................................................................................................ 52

## TABLE OF AUTHORITIES

### Cases

*Applied Energetics, Inc. v. NewOak Cap. Mkts., LLC*,
645 F.3d 522 (2d Cir. 2011) ........ 36, 40, 46, 47

*Carter v. SP Plus Corp.*,
172 F.4th 970 (7th Cir. 2026) ........ 37

*Cater v. MyHeritage (USA) Inc.*,
25-cv-224, 2026 WL 851264 (N.D. Ill. Mar. 27, 2026) ........ 19, 24, 25

*ChampionsWorld, LLC v. U.S. Soccer Fed'n, Inc.*,
487 F. Supp. 2d 980 (N.D. Ill. 2007) ........ 47

*Coinbase, Inc. v. Suski*,
602 U.S. 143 (2024) ........ passim

*Courtois v. Millard*,
529 N.E.2d 77 (Ill. App. Ct. 1988) ........ 37, 38, 39

*Dasher v. RBC Bank (USA)*,
745 F.3d 1111 (11th Cir. 2014) ........ 36, 39, 40, 43

*Domer v. Menard, Inc.*,
116 F.4th 686 (7th Cir. 2024) ........ 24

*Domka v. Portage Cnty., Wis.*,
523 F.3d 776 (7th Cir. 2008) ........ 13

*Dove v. Ind. Dep't of Corr.*,
No. 25-1837, 2026 WL 936133 (7th Cir. Apr. 7, 2026) ........ 13

*Econ. Folding Box Corp. v. Anchor Frozen Foods Corp.*,
515 F.3d 718 (7th Cir. 2008) ........ 13

*Edwards v. TikTok, Inc.*,
804 F. Supp. 3d 1049 (C.D. Cal. 2025) ........ 41, 42

*Goldman, Sachs & Co. v. City of Reno*,
747 F.3d 733 (9th Cir. 2014) ........ 36, 43, 44

*Goldman, Sachs & Co. v. Golden Empire Schs. Fin. Auth.*,
764 F.3d 210 (2d Cir. 2014) .......... 44, 45

*Granite Rock Co. v. Int'l Bhd. of Teamsters*,
561 U.S. 287 (2010) .......... 36

*Hanc & Brubaker Holdings v. NXT LVL Servs., LLC*,
22-cv-1526, 2023 WL 1069854 (N.D. Ill. Jan. 27, 2023) .......... 46

*Hartford Accident & Indem. Co. v. Lin*,
97 F.4th 500 (7th Cir. 2024) .......... 31

*Hernandez v. Cook Cnty. Sheriff's Off.*,
634 F.3d 906 (7th Cir. 2011) .......... 18, 20

*Homestake Lead Co. of Missouri v. Doe Run Resources Corp.*,
282 F. Supp. 2d 1131 (N.D. Cal. 2003) .......... 42

*Kass v. PayPal Inc.*,
75 F.4th 693 (7th Cir. 2023) .......... 34

*Kinkel v. Cingular Wireless LLC*,
223 Ill.3d 1 (Ill. 2006) .......... 26

*McCleary v. Wells Fargo Sec., LLC*,
29 N.E.3d 1087 (Ill. App. Ct. 2015) .......... 31

*Millar v. Express Techs. Ltd.*,
25-cv-1273, 2025 WL 4061252 (N.D. Cal. Nov. 25, 2025) .......... 50, 51

*Miracle-Pond v. Shutterfly, Inc.*,
19-cv-4722, 2020 WL 2513099 (N.D. Ill. May 15, 2020) .......... passim

*Morgan v. Sundance, Inc.*,
596 U.S. 411 (2022) .......... 37, 42

*Patten Secs. Corp. v. Diamond Greyhound & Genetics, Inc.*,
819 F.2d 400 (3d Cir. 1987) .......... 43, 44

*Qualls v. Cunningham*,
183 Fed. App'x 564 (7th Cir. 2006) .......... 17

*Reinhart Foodservice, LLC v. Chicago Roadhouse Concepts, LLC*,
14-cv-4943, 2016 WL 4011226 (N.D. Ill. July 27, 2016) ........ 19

*Sauk Prairie Conservation All. v. United States Dep't of the Interior*,
944 F.3d 664 (7th Cir. 2019) ........ 21

*Southport Bank v. Miles*,
10-cv-8321, 2014 WL 1292452 (N.D. Ill. Mar. 27, 2014) ........ 25, 26, 27, 30

*Suski v. Coinbase*,
55 F.4th 1227 (9th Cir. 2022) ........ 36, 43

*UBS Fin. Servs., Inc. v. Carilion Clinic*,
706 F.3d 319 (4th Cir. 2013) ........ 44

*United States v. Webster*,
775 F.3d 897 (7th Cir. 2015) ........ 20

*United Steel v. TriMas Corp.*,
531 F.3d 531 (7th Cir. 2008) ........ 40, 41

*ValuePart, Inc. v. Farquhar*,
14-cv-3004, 2014 WL 4923179 (N.D. Ill. Sept. 29, 2014) ........ 47

*Vukadinovich v. Bd. of Sch. Trs. of Mich. City Area Schs.*,
776 F. Supp. 1325 (N.D. Ind. 1991) ........ 19

*Wallrich v. Samsung Elecs. Am., Inc.*,
106 F.4th 609 (7th Cir. 2024) ........ 32, 33

*White v. United States*,
8 F.4th 547 (7th Cir. 2021) ........ 21

*WorldCrisa Corp. v. Armstrong*,
129 F.3d 71 (2d Cir. 1997) ........ 42

## INTRODUCTION

Defendant-Appellant ExpressVPN asks this Court to compel arbitration under a clause that ExpressVPN itself deleted from the parties' agreement. That request should be denied.

To compel arbitration, the moving party must first put forth a prima facie case that a valid arbitration agreement exists. ExpressVPN never made that showing—its motion was based solely on a superseded agreement from May 2022. Were it not for Plaintiff-Appellee Greenwood, ExpressVPN would never have acknowledged to the District Court its own September 2022 Terms of Service, which replaced the parties' arbitration clause with a forum selection clause. Having presented only the original contract between the parties—and having withheld the one that mattered—ExpressVPN cannot claim to have met its prima facie burden, let alone to have established a valid arbitration agreement.

The facts are not complicated. Plaintiff purchased a VPN plan from ExpressVPN in May 2022 under Terms of Service that included a mandatory arbitration provision. Those Terms also expressly reserved to ExpressVPN the unilateral right to modify the parties' agreement at any time and without notice. ExpressVPN exercised that right in September 2022, replacing its Terms in their entirety with a revised version that eliminated arbitration as the dispute resolution mechanism.

ExpressVPN knew all of this when it moved to compel. It presented the District Court with only the May 2022 Terms, never mentioning it had replaced them with Terms fatal to its own motion. A prima facie showing built on a knowingly incomplete

record is no showing at all. The District Court correctly denied the motion and should be affirmed.

What's more, ExpressVPN now abandons its prior positions and burdens this Court with two arguments it is raising for the first time on appeal. In the District Court, ExpressVPN contested whether Plaintiff received notice of the modification to the Terms and also contested the legal significance of Plaintiff's interactions with ExpressVPN following the deletion of the arbitration clause. In addition, ExpressVPN expressly acknowledged that if those later Terms applied, the parties would be bound to litigate their disputes in court. On appeal, ExpressVPN pivots entirely: it now disputes the factual underpinnings of Plaintiff's acceptance of the September 2022 Terms and argues, for the first time, that the May 2022 arbitration clause independently survives those Terms regardless. ExpressVPN cannot bypass the District Court and reframe its case on appeal. Both arguments are waived.

ExpressVPN's one preserved argument—that a delegation clause in the May 2022 Terms requires an arbitrator to decide arbitrability—fails for the same reason its motion failed: those Terms no longer exist. When ExpressVPN exercised its modification right and replaced the May 2022 Terms wholesale, it extinguished every provision therein. A provision that no longer exists cannot send this or any dispute to an arbitrator. ExpressVPN's position—that a party who merely points to any once-valid arbitration agreement with a delegation clause, no matter how outdated, can forever force all disputes into arbitration—is irreconcilable with federal arbitration and state contract law.

In sum, ExpressVPN asks this Court to save it from its own drafting choices and unsuccessful litigation strategies. The Court should decline that invitation, hold that ExpressVPN waived the first two of its appellate issues and that its third argument fails on the merits, and affirm the District Court.

## JURISDICTIONAL STATEMENT

ExpressVPN's Jurisdictional Statement is complete and correct.

## STATEMENT OF THE ISSUES

1. Did ExpressVPN waive its first appellate argument (that Plaintiff failed to meet his evidentiary burden regarding acceptance of the September 2022 Terms) by not only failing to raise it below, but also by accepting and relying on Plaintiff's factual allegations rather than objecting to them before the District Court?

2. Did ExpressVPN waive its second appellate argument (that the May 2022 arbitration provision survives supersession absent a "clear and specific waiver" of that provision) by not only failing to raise it below, but also by affirmatively arguing that litigation, not arbitration, would be the outcome if the September 2022 Terms apply?

3. When a party modifies a binding agreement pursuant to a contractual provision that allows it to make unilateral modifications without notice, may the same party later disclaim the new version of the agreement?

4. When a contract containing an arbitration clause addressed to "all disputes" is superseded by a second contract that replaces the arbitration clause with a forum selection clause designating the courts of a specific jurisdiction as the fora for "all disputes," is the terminated arbitration clause nonetheless still binding on the parties?

5. If parties to a contract terminate an arbitration agreement, does the terminated arbitration provision's delegation clause nonetheless survive and require disputes be resolved by the arbitrator?

## STATEMENT OF THE CASE

### I. FACTUAL BACKGROUND

Plaintiff, an Illinois citizen, SER-005 ¶ 39, enrolled in an ExpressVPN plan, paying $99.95 on May 23, 2022, SER-008 ¶¶ 91, 93. Plaintiff neither wanted nor expected his ExpressVPN plan to renew. *Id.*

At the time of Plaintiff's enrollment, ExpressVPN had a set of terms posted to its website (the "May 2022 Terms"). SA-3 ¶ 13; SER-008 ¶ 91. The District Court found that upon enrolling in ExpressVPN, Plaintiff was bound by those Terms. A-4–5. That finding is not now on appeal. The May 2022 Terms had an 8-paragraph arbitration provision under the heading "15. Arbitration" and provided that "all disputes" would be settled via arbitration. SA-17–19. Critically for this appeal, the May 2022 Terms also permitted ExpressVPN to make unilateral updates to the parties' agreement:

> 2. Modification
>
> ExpressVPN may update the Terms from time to time without notice. If you continue to use ExpressVPN's Services, Content, Site, Apps, or Software after these changes take effect, then you agree to the revised Terms. The current version of the Terms is available on the Site. You understand and agree that it is your obligation to review these Terms from time to time in order to stay informed on current rules and obligations. Notification on any core changes to the Terms will be provided to subscribers through an email message or update to the Site. Your use of the Content or

> Services following the changes to these Terms constitutes your acceptance of the changed Terms.

SA-8–9.

On September 15, 2022, Defendant exercised its unilateral modification right and replaced the May 2022 Terms on its website with a new version (the "September 2022 Terms").[1] *See, e.g.*, Appellant's Br. (ECF No. 12) ("Br.") at 9; SER-079 ¶ 3; SER-082. Per the language of the May 2022 Terms' modification clause, SA-8–9, the September 2022 Terms became effective on that date.

The September 2022 Terms removed the entire 8-paragraph "Arbitration" section found in the May 2022 Terms and replaced it with a section entitled "Dispute Resolution" that makes no reference whatsoever to arbitration:

> 17. Dispute Resolution
> By accepting these Terms and/or using the Services you irrevocably agree that all disputes arising out of or relating to this Agreement or the use of the Services shall be finally settled by the applicable Courts located in Tortola, British Virgin Islands (BVI).

SA-80. The September 2022 Terms also added sections on "Chargebacks" and "ExpressVPN Keys," renumbered sections to account for those additions, and made additional changes to every other section of the May 2022 Terms of Service (except the

---

[1] Plaintiff adopts the same defined terms ("May 2022 Terms" and "September 2022 Terms") as Defendant, *see* Br. at 1; *id*. at 1, n.1, when referring to the two versions of ExpressVPN's Terms of Service on which this appeal turns.

The September 2022 Terms are found in the record at SA-74–81 (reproduction of Dist. Ct. ECF No. 49-3) and it is those pages that the District Court was referring to in the opinion now on appeal when it wrote of the "October 2022 Terms." *See* A-5-6 (District Court citing "R. 49-3"). Curiously, Defendant's opening appellate brief cites a much later update to ExpressVPN's Terms of Service. *See* Br. at 9 (citing SA-100).

one-sentence “Choice of Law” section). *Compare, e.g.*, SA-17–19 *with* SA-80 (“Arbitration” section replaced with “Dispute Resolution” section), SA-17 *with* SA-80 (insertion of “Chargebacks” section), SA-13 *with* SA-78 (revising “License” section), SA-17 *with* SA-80 (no change to “Choice of Law” section beyond renumbering). From the September 15, 2022 update through the end of Plaintiff’s subscription, ExpressVPN’s Terms of Service did not include an arbitration provision. *See* SA-23, 74–99; *see also* SER-009 ¶ 100.

After ExpressVPN implemented the September 2022 Terms, Plaintiff was charged $99.95 and $116.95 for unauthorized renewals in May 2023 and 2024, respectively. SER-008 ¶¶ 94–95. After the first unauthorized charge in May 2023, Plaintiff attempted to cancel via ExpressVPN’s website and app. *Id.* ¶¶ 96–98. Those attempts were unsuccessful; Plaintiff’s subscription ended in June 2025 only because ExpressVPN terminated it after several unsuccessful attempts to charge him again. SER-009 ¶ 100.

## II. PROCEDURAL BACKGROUND

Plaintiff brought suit on July 16, 2025 and amended his complaint on October 3, 2025 and November 24, 2025. Appellate Short Record, ECF No 1-1. The operative complaint alleges violations of Illinois’s Automatic Contract Renewal Act, 815 ILCS 601/1, *et seq.*, and Consumer Fraud and Deceptive Business Practices Act, 815 ILCS § 505/1, *et seq.*, as well as common law claims for conversion, unjust enrichment, and money had and received. SER-011–15.

On January 16, 2026, Defendant filed a motion to dismiss the Second Amended Complaint pursuant to Rule 12, or in the alternative, to compel arbitration. SER-108. In its motion papers, ExpressVPN included only one version of ExpressVPN's Terms of Service, the May 2022 Terms, SA-8–19, which ExpressVPN stated were available on its website at the time of Plaintiff's May 2022 enrollment, SA-14, SER-008 ¶ 91. ExpressVPN's motion to compel arbitration was based on the arbitration provision from those terms. SER-030. As part of his opposition, Plaintiff filed three subsequent-in-time versions of ExpressVPN's Terms of Service covering the remainder of the period in which Plaintiff's subscription was active, including the September 2022 Terms—none contained the arbitration clause found in the May 2022 Terms or any other arbitration clause. SA-23; *see also* SA-80, SA-89, SA-100 (dispute resolution provisions).

Following briefing and oral argument, the District Court Found that when Plaintiff enrolled in May 2022, he agreed to be bound by the terms available on the website at that time (i.e., the May 2022 Terms). A-4–5. However, the District Court correctly found ExpressVPN modified those Terms via the unilateral modification provision and thus, the September 2022 Terms superseded the May 2022 terms. A-5–6.

**SUMMARY OF ARGUMENT**

The Court should affirm the District Court's denial of ExpressVPN's motion to compel arbitration. ExpressVPN's appeal rests on three arguments. The first two were never raised in the District Court and are therefore waived. Regardless of waiver, all three fail on the merits.

ExpressVPN's principal argument on appeal is that Plaintiff submitted no evidence establishing his assent to the September 2022 Terms. This argument was never presented to the District Court and is therefore waived. Indeed, ExpressVPN affirmatively withheld the September 2022 Terms from the District Court, relying solely on the May 2022 Terms and their arbitration provision when it moved to compel arbitration. Only after Plaintiff submitted the later, arbitration-free Terms did ExpressVPN acknowledge their existence. On reply, although advancing numerous arguments to avoid the September 2022 Terms' application, ExpressVPN never asserted Plaintiff had failed to meet any evidentiary burden regarding acceptance. For instance, ExpressVPN accepted as true Plaintiff's allegations that he used ExpressVPN's website and app to attempt to cancel his subscription after the September 2022 Terms were posted, disputing only the legal significance of that conduct (whether it constituted "continued use" and therefore acceptance of the September 2022 Terms) rather than disputing the facts underlying the allegations. Having accepted below that Plaintiff's interactions with the platform occurred, ExpressVPN cannot now retreat and raise an evidentiary argument. Nor did ExpressVPN raise this at oral argument, even after the District Court directly invited ExpressVPN to explain why the September 2022 Terms should not be enforced.

ExpressVPN's evidentiary challenge is further undermined by its own conduct before the district court. The most probative evidence of Plaintiff's interactions with ExpressVPN's platform—Plaintiff's account data—belongs to ExpressVPN, which produced that data in December 2025. Had ExpressVPN raised its new evidentiary

argument below—rather than conceding Plaintiff's use—Plaintiff would have introduced that evidence into the record. A party that possesses the relevant evidence, withholds it, and then attacks the resulting record on appeal should not benefit from a gap it created.

Indeed, ExpressVPN's own preferred evidentiary framework makes clear that the District Court did not err. The summary judgment standard it invokes applies equally to the moving party, and under that standard a fact that goes uncontested is not reserved for the factfinder and needs no affirmative proffer. Because ExpressVPN never disputed anywhere in the District Court record that Plaintiff used its website and app after the September 2022 Terms were posted, that fact was uncontested below and the District Court was correct not to rule against Plaintiff on the grounds that he did not establish a fact that both parties treated as established. ExpressVPN cannot raise an evidentiary objection on appeal that it chose not to raise below when it could have been answered.

ExpressVPN's second argument is that the September 2022 Terms did not contain a "clear and specific waiver" of the May 2022 arbitration clause and therefore that clause survived. This argument is likewise waived. ExpressVPN never advanced this theory in the District Court. More tellingly, the position ExpressVPN *did* take below directly contradicts the argument it now advances. In its reply brief and at oral argument, ExpressVPN represented that if the September 2022 Terms applied, those Terms' forum-selection clause required *litigation* in the British Virgin Islands—not

arbitration.[2] That position is irreconcilable with ExpressVPN's current contention that the May 2022 arbitration clause and September 2022 forum-selection clause can be "harmonized."

But even if the Court reaches the merits, the District Court should be affirmed. First, the May 2022 Terms' unilateral modification clause resolves whether Plaintiff accepted the September 2022 Terms. Under Illinois law, where parties agree in advance that one party may unilaterally modify their contract by posting updated terms to a website, modifications made pursuant to that right take effect without any additional act of acceptance by the other party; the original agreement's modification clause itself supplies the necessary consent. The May 2022 Terms could not be clearer: ExpressVPN reserved the right to "update the Terms from time to time *without notice*," defined the operative Terms as those posted "on the Site," treated posting as the trigger for changes "taking effect," and placed on users the obligation to consult the site for "current rules and obligations." When ExpressVPN exercised that reserved right and posted the September 2022 Terms, no separate acceptance by Plaintiff was required to bind ExpressVPN. Nor can ExpressVPN selectively invoke the modification clause when it wishes to impose new terms on users while simultaneously disclaiming those same terms when they are invoked against it, including because doing so would violate the May 2022 Terms' implied covenant of good faith and fair dealing. Having exercised the

[2] Prior to ExpressVPN's appeal, the District Court had requested briefing regarding whether the forum selection clause required Plaintiff to bring this action in courts of the BVI. *See* A-7. This issue is not ripe for purposes of this appeal and will be resolved by the District Court.

right to draft and post updated Terms, ExpressVPN is bound by what it posted. To the extent the Court disagrees with Plaintiff's position, it should remand for further factual development.

Second, the September 2022 Terms superseded the May 2022 Terms in their entirety under settled Illinois contract law, which provides that a complete later contract covering the same subject matter terminates every provision of the prior agreement—including any arbitration clause—without requiring the later contract to address each prior term individually. ExpressVPN's "clear and specific waiver" argument has no support in this Circuit. The only Seventh Circuit precedent ExpressVPN cites arose in a wholly different context: a dispute over the *scope* of an arbitration clause in an agreement that remained fully operative, not a case in which the entire prior contract had been superseded. Requiring special language to extinguish an arbitration clause while imposing no comparable requirement for forum-selection clauses, damages caps, or any other term is precisely the kind of arbitration-favoring rule that the Supreme Court prohibited in *Morgan v. Sundance*. The rule ExpressVPN advocates derives exclusively from out-of-circuit district court decisions that grounded it in the FAA's presumption of arbitrability—a presumption that applies only to the *scope* of a valid, existing arbitration agreement, not to the threshold question of whether such an agreement continues to exist at all.

Even if such a clear and specific waiver was required, the September 2022 Terms satisfy it. ExpressVPN replaced its two-page mandatory arbitration section with a "Dispute Resolution" clause providing that courts in Tortola, British Virgin Islands

have exclusive jurisdiction over "all disputes" arising out of the agreement. Both provisions are all-inclusive and mandatory; they designate categorically and irreconcilably different forums. The removal of an 8-paragraph arbitration provision and its replacement with an exclusive judicial forum clause is a clear signal that the arbitration obligation had ended.

Third, the delegation argument ExpressVPN did preserve fails because, as the Supreme Court's unanimous decision in *Coinbase, Inc. v. Suski* confirms, courts (not arbitrators) resolve the precise question presented here: whether a first agreement was superseded by a second. The threshold question of which contract governs must be answered by a court before a delegation clause in one of them can be given effect. ExpressVPN's contrary rule—that a delegation clause in an earlier agreement permanently insulates arbitrability questions from judicial review regardless of what later agreements provide—would impermissibly elevate an arbitration provision's delegation clause above the superseding agreement and above ordinary contract law, which is exactly what *Coinbase* and other Supreme Court caselaw forbids.

Finally, the recent *Millar v. Express Techs. Ltd.* decision that ExpressVPN invokes (of which the District Court was fully aware) is not to the contrary. The *Millar* plaintiff argued that ExpressVPN had *waived* its right to compel arbitration—a theory that presupposes the continued existence of a valid arbitration agreement. The *Millar* court addressed only that waiver question (not contract supersession) and determined the question was delegated to the arbitrator; it never analyzed whether the September 2022 Terms superseded the May 2022 Terms as a matter of contract law. Plaintiff here makes

no waiver argument. His contention is one of supersession: that under ExpressVPN's own modification clause and controlling Illinois law, the September 2022 Terms replaced the May 2022 Terms entirely. The *Millar* decision is silent on that question.

## ARGUMENT

### I. EXPRESSVPN WAIVED THE FIRST TWO ISSUES RAISED BY ITS APPEAL.

"[I]t is axiomatic that an issue not first presented to the district court may not be raised before the appellate court as a ground for reversal." *Econ. Folding Box Corp. v. Anchor Frozen Foods Corp.*, 515 F.3d 718, 720 (7th Cir. 2008). Despite this settled rule, ExpressVPN asks this Court to reverse the District Court on two grounds it plainly failed to present below: (1) Plaintiff provided no evidence of his assent to the September 2022 Terms; and (2) the arbitration provision in the May 2022 Terms survived ExpressVPN's decision to remove it from the September 2022 Terms. Br. at 4.

Accepting ExpressVPN's invitation to reach these new arguments "would undermine the essential function of the district court," *Domka v. Portage Cnty., Wis.*, 523 F.3d 776, 783 (7th Cir. 2008), and runs afoul of this Circuit's well-settled rule that newly-raised arguments are waived, *see, e.g.*, *Dove v. Ind. Dep't of Corr.*, No. 25-1837, 2026 WL 936133, at *3 (7th Cir. Apr. 7, 2026) ("A party waives any argument that it does not raise before the district court[.]").

This Court should affirm the District Court and deem both issues waived.

#### A. ExpressVPN Waived Its Argument That Plaintiff Purportedly Failed to Offer Evidence of Assent to the September 2022 Terms.

ExpressVPN claims the District Court erred by "presuming Plaintiff's assent to the September 2022 Terms without any supporting evidence," Br. at 15, when it held

that those Terms superseded the May 2022 Terms and that "the parties are no longer subject to a mandatory arbitration provision," A-6. According to ExpressVPN, "Plaintiff submitted no evidence . . . establishing assent to the September 2022 Terms." Br. at 15; *see also*, *e.g.*, Br. at 22. This argument was never raised with the District Court and is therefore waived.

**1. The Assent Argument Was Never Presented to the District Court.**

In its opening brief seeking to compel arbitration below, ExpressVPN argued only that Plaintiff agreed to the May 2022 Terms and their arbitration provision. SER-030–31. ExpressVPN's single-page treatment of the issue did not alert the District Court to even the *existence* of the September 2022 Terms, let alone that those Terms had removed the arbitration provision. *See id.*

Only after Plaintiff submitted the September 2022 Terms and their removal of the arbitration clause, *see* SER-053, did ExpressVPN confront them. On reply, Defendant admitted that the May 2022 Terms' "arbitration clause was removed . . . on September 15, 2022," *see, e.g.*, SER-073, and did not challenge the authenticity of the September 2022 Terms that Plaintiff filed with his opposition. Rather than evidentiary insufficiency, ExpressVPN advanced six distinct arguments in an effort to escape those Terms' application:

- The May 2022 Terms' delegation clause required the arbitrator, not the court, to resolve the dispute over which Terms applied. SER-073, SER-074–75.

- The May 2022 Terms governed because the disclosures on ExpressVPN's website at the time of Plaintiff's sign-up were the but-for cause of all his claims.[3] SER-073.

- ExpressVPN never provided the "notice" purportedly required by the May 2022 Terms' modification provision, meaning the September 2022 Terms were not binding on ExpressVPN. *Id*.

- Plaintiff had not accepted the September 2022 Terms because he failed to explain why his attempts to cancel his subscription constituted "continue[d] use" of ExpressVPN's "VPN Service." *Id*.

- The May 2022 arbitration provision—requiring arbitration, not litigation—must apply because, by filing a federal lawsuit, Plaintiff acted contrary to the forum selection clause in later Terms by not filing his lawsuit in "Courts located in Tortola, British Virgin Islands." *Id*.; SA-80 ("17. Dispute Resolution").

- The District Court should follow the Central District of California's decision in *Millar v. Express Techs. Ltd.*, 25-cv-01273 (C.D. Cal. Jan. 20, 2026), and compel arbitration.[4] SER-073–74.

Not one of these six arguments questioned whether Plaintiff had met his evidentiary burden. ExpressVPN never argued that the record was devoid of evidence sufficient to establish Plaintiff's acceptance of the September 2022 Terms.

---

[3] This is incorrect. For example, Plaintiff also challenges ExpressVPN's post-enrollment conduct, such as its failure to offer an easy-to-use cancellation mechanism at the time Plaintiff tried to cancel his automatically-renewing plan—after the September 2022 Terms were live on Defendant's website. *See, e.g.,* SER-012 ¶ 134 (alleging violation of Illinois Automatic Contract Renewal Act due to ExpressVPN's failure "to provide a cost-effective, timely, and easy-to-use mechanism for cancellation").

[4] Before the District Court and again in its opening brief here, Defendant misrepresents the *Millar* court's opinion and its import here, as explained *infra* § IV.

### 2. ExpressVPN Possesses (And Has Produced) the Very Evidence It Now Claims Is Absent from the Record.

ExpressVPN's evidentiary argument is particularly difficult to square with its conduct. ExpressVPN is not without knowledge of Plaintiff's interactions with its platform after September 2022. In response to Plaintiff's discovery requests, in December 2025 Defendant produced Plaintiff's account data tending to show use of ExpressVPN's website or app subsequent to the arbitration clause's deletion. That evidence—in Defendant's own possession—bears directly on the question of whether Plaintiff used the platform after the September 2022 Terms took effect.

Had ExpressVPN raised its evidentiary argument in the District Court, Plaintiff would have introduced that evidence into the record. The motion to compel was decided without it only because ExpressVPN, after first concealing the existence of the September 2022 Terms, never put Plaintiff or the District Court on notice that evidentiary sufficiency was at issue. A party that possesses relevant evidence, withholds it from the District Court, and then attacks the evidentiary record on appeal cannot complain of a gap it helped to create.

This dynamic further supports waiver. By keeping silent on evidentiary sufficiency in the District Court—even while it possessed the most probative evidence on that question—ExpressVPN deprived Plaintiff of the opportunity to respond and deprived the District Court of a complete record. It cannot now raise the issue on appeal.

### 3. ExpressVPN's Reply Argument Addressing "Continued Use" Reflects an Implicit Concession That Plaintiff Did Interact with the Platform After September 2022.

The record further shows that ExpressVPN's litigation conduct below is inconsistent with the argument it advances here. As noted above, *supra* at 14, after Plaintiff notified the District Court of the existence of additional Terms, ExpressVPN argued on reply that Plaintiff's attempts to cancel his subscription—via ExpressVPN's website and app—did not constitute "use" or "continued use" of the "VPN Service" within the meaning of the May 2022 Terms.[5] In making that argument, ExpressVPN accepted as true Plaintiff's underlying factual allegations—that he attempted to cancel his subscription via ExpressVPN's website and app after the September 2022 Terms took effect, SER-008 ¶¶ 96–98— and focused instead on their *legal significance.* It never disputed that Plaintiff had in fact attempted to cancel using those platforms.

This matters for two reasons. First, ExpressVPN's reliance on Plaintiff's cancellation allegations to advance its own position below precludes it from now challenging the evidentiary sufficiency of those same allegations. *See Qualls v. Cunningham*, 183 Fed. App'x 564, 567 (7th Cir. 2006) (rejecting challenge to evidentiary sufficiency of materials that appellant himself cited as evidence). Second, and more broadly, by contesting only the *legal* significance of Plaintiff's interactions with the platform—rather than those interactions' *existence*—ExpressVPN effectively conceded

[5] Notably, use of the "VPN Service" is not the only type of use the May 2022 Terms' unilateral modification provision deems to be assent. *See supra* at 4 (reproducing modification clause).

that those interactions occurred. Having chosen that litigation path below, it cannot now retreat and contest the underlying facts.

Defendant's silence at the motion hearing confirms the point. When the District Court asked defense counsel, "Why shouldn't the Court enforce your client's own modification to the terms of service in [September] of 2022?", counsel raised two arguments: (1) that the issue was for the arbitrator, and (2) that ExpressVPN never sent users an email notifying them of the change. SA-111–12.[6] Assent and its evidentiary sufficiency went unmentioned. Indeed, when the District Court noted in a colloquy that the May 2022 Terms "contained language that a consumer agreed to the revised terms if they continued to use the VPN," defense counsel responded "with the important caveat that . . . users would be given notice . . . and that's not alleged to have happened here," SER-112, staying entirely silent on the "important caveat" about Plaintiff's acceptance it now raises on appeal.

---

[6] The most Defendant can say is that during the hearing—that is, after briefing was complete—defense counsel uttered the sentence "[a]nd there's no allegation that [Plaintiff] *saw and accepted* this modification such that it might apply to his claims[.]" SA-111–12 (emphasis added). This (1) makes clear that ExpressVPN had no objection to using allegations to support Plaintiff's position, *see also* SER-072 (reply brief criticizing Plaintiff for a lack of allegations, not evidence, regarding notice); and (2) in context, was merely part and parcel of ExpressVPN's argument that modification was impossible because no notice was given (and thus no agreement capable of being accepted existed). Moreover, it is well-established "that 'skeletal' arguments may be properly treated as waived." *Hernandez v. Cook Cnty. Sheriff's Off.*, 634 F.3d 906, 913 (7th Cir. 2011).

### 4. ExpressVPN Waived Any Evidentiary Objection in the District Court as to Whether Plaintiff Used ExpressVPN's Site or App After the September 2022 Terms Were Posted.

ExpressVPN's argument that Plaintiff bore a "Rule 56-like" evidentiary burden, Br. at 18, 21, also cuts against ExpressVPN. That same standard applies to the moving party. "When a party does not dispute a fact . . . that fact cannot be said to be reserved to the factfinder such that it requires the court to try that fact before compelling arbitration." *Cater v. MyHeritage (USA) Inc.*, 25-cv-224, 2026 WL 851264, at *7–8 (N.D. Ill. Mar. 27, 2026). There was no genuine factual dispute before the District Court regarding Plaintiff's use of ExpressVPN's website and app after September 2022 because ExpressVPN never contested that fact. *See, e.g.*, *Reinhart Foodservice, LLC v. Chicago Roadhouse Concepts, LLC*, 14-cv-4943, 2016 WL 4011226, at *3 n.4 (N.D. Ill. July 27, 2016) (deeming objection to use of "unsigned and unsworn interrogatory answers" waived on summary judgment where defendant did not move to strike or otherwise object); *Vukadinovich v. Bd. of Sch. Trs. of Mich. City Area Schs.*, 776 F. Supp. 1325, 1326 (N.D. Ind. 1991) (A court may rely "on unsworn or unauthenticated documents in determining a summary judgment motion . . . in the absence of objection."). Thus, there was no reason to reach this issue and the District Court should be affirmed.

Moreover, the evidentiary record ExpressVPN criticizes is of its own making. After faulting Plaintiff for submitting "no declaration, no affidavit, no testimony, and no evidence," Br. at 20, ExpressVPN proceeds to suggest that even Plaintiff's testimony might not suffice, *id.* at 21. But the most probative evidence of Plaintiff's interactions with ExpressVPN's platform belongs to Defendant itself: Plaintiff's account information

and related business records. Rather than come forward with that evidence—or acknowledge that that evidence would undermine its position—ExpressVPN first concealed the existence of the September 2022 Terms and then, only when Plaintiff raised them, admitted that it had removed the arbitration clause less than four months after Plaintiff enrolled. At no point has ExpressVPN denied that Plaintiff accessed its website or app after that change; below, it argued only that his attempts to cancel might not satisfy the contractual standard for accepting a modification, and here it argues that Plaintiff failed to meet his evidentiary burden. Having withheld the relevant evidence and failed to raise this argument below, ExpressVPN cannot benefit from the gap it created.

#### 5. Any Reply Argument Seeking to Broaden ExpressVPN's Bases for Appeal Is Also Waived.

To the extent ExpressVPN's forthcoming reply brief seeks to broaden its first appellate issue to include additional bases for appeal, such as a purported lack of evidence of notice of the September 2022 Terms, those arguments are also waived. While ExpressVPN's opening appellate brief sprinkles in occasional references to notice, *see, e.g.*, Br. at 12 (factual and procedural background section stating "Plaintiff has not even argued, much less offered evidence, that he had notice of the update"), the obvious focus of ExpressVPN's first appellate issue and the argument in favor of it is evidence of Plaintiff's assent to the September 2022 Terms, not notice of them. These "skeletal arguments may be properly treated as waived." *Hernandez*, 634 F.3d at 913 (quotation omitted); *see also, e.g.*, *United States v. Webster*, 775 F.3d 897, 904 (7th Cir. 2015) (arguments

not raised in appellant's opening brief are waived). ExpressVPN knows well how to argue that the September 2022 Terms do not bind for lack of notice, *see* SA-111–14 (motion hearing transcript addressing notice); SER-072 (ExpressVPN arguing to District Court that Plaintiff failed to "allege" he received notice), but failed to make these arguments to this Court. "A party waives any argument that it does not raise before the district court or, if raised in the district court, it fails to develop on appeal." *Sauk Prairie Conservation All. v. United States Dep't of the Interior*, 944 F.3d 664, 674 (7th Cir. 2019); *see also White v. United States*, 8 F.4th 547, 552 (7th Cir. 2021) ("A party that omits from its opening appellate brief any argument in support of its position waives or abandons that party's claim on appeal.").

The Court should deem the first issue raised by ExpressVPN's appeal waived.

### B. ExpressVPN Waived Its Argument That the May 2022 Arbitration Clause Cannot Be Extinguished Absent "Clear and Specific Waiver."

ExpressVPN also claims that the District Court erred because the September 2022 Terms lacked "a clear and specific waiver directed to the arbitration clause itself," and therefore the May 2022 arbitration clause survived. Br. at 15–16. This argument, too, was never presented to the District Court.

As discussed above, in its opening memorandum below ExpressVPN treated enforcing the arbitration clause as a foregone conclusion and concealed the September 2022 Terms from the District Court entirely. When forced to confront those Terms on reply, ExpressVPN's arguments fell into two broad categories: (1) reasons the entirety of the May 2022 Terms should apply *instead of* the September 2022 Terms; and (2) reasons

the court should refer the dispute to the arbitrator. *See supra* pp. 14–15. ExpressVPN never argued that if the September 2022 Terms *were* binding the May 2022 arbitration provision nevertheless survived. Defense counsel was equally silent at the hearing. *See generally* SA-101–17.

Indeed, ExpressVPN's own statements in the District Court contradict the argument it advances here. Below, ExpressVPN consistently argued that if the May 2022 Terms applied, the result was *litigation*—not arbitration. *See* SA-115–15 (Mot. Hr'g Tr. at 29:23–30:2: "[I]f they succeed on that . . . then they would be bound *to litigate* in the British Virgin Islands." (emphasis added)); SER-073 (stating the "forum-selection provision requir[es] [Plaintiff's] claims to be resolved via *litigation* in the BVI" (emphasis added)). Far from suggesting that the forum-selection clause and the arbitration clause could be "harmonized," as ExpressVPN now contends, Br. at 16, Defendant asserted the forum-selection clause fully displaced the arbitration obligation. That position is incompatible with the argument ExpressVPN advances on appeal.

The Court should deem the second issue raised by ExpressVPN's appeal waived.

## II. REGARDLESS OF EXPRESSVPN'S WAIVER OF APPELLATE ISSUES, THE DISTRICT COURT SHOULD BE AFFIRMED.

Even if the Court were to consider ExpressVPN's newly raised arguments (it should not), ExpressVPN has offered no reason to reverse the District Court: each of its three arguments fail on their merits. First, because the May 2022 Terms contained a unilateral modification clause, Plaintiff was not required to separately assent to the September 2022 Terms. Second, the arbitration agreement did not survive the

modification of the Terms; no "clear and specific waiver" of arbitration was required considering both: (1) Supreme Court and Illinois case law; and (2) the parties' agreement that ExpressVPN could unilaterally amend the Terms by posting the new Terms to its website. And third, which set of Terms applies is wholly within the province of the courts and there are no grounds for delegating this question to an arbitrator when the May 2022 Terms (and their arbitration clause) were terminated.

For the foregoing reasons and as further explained below, the Court should reject each of Defendant's arguments and affirm the District Court.

### A. Under the May 2022 Terms' Unilateral Modification Clause, Plaintiff Was Not Required to Take Any Action to Bind ExpressVPN to the September 2022 Terms.

The District Court was correct to hold that the September 2022 Terms are binding on ExpressVPN, and that ExpressVPN therefore cannot force Plaintiff into arbitration. ExpressVPN argues that the District Court erred because Plaintiff has not shown he accepted the September 2022 Terms, and that such evidence is necessary to rebut ExpressVPN's showing that an agreement to arbitrate was made. Br. at 15, 19–22. But Defendant ignores the legal effect of the modification section that it drafted and included in the May 2022 Terms. Those Terms contained an express modification clause that granted ExpressVPN the unilateral right to update its Terms by posting revised versions to its website. SA-8–9. Defendant exercised that right when it posted the September 2022 Terms. Under controlling Illinois law, modifications made pursuant to such a clause take effect without any fresh act of acceptance by the other party. The parties' agreement to the unilateral modification clause in the May 2022 Terms

provided all the "acceptance" that was required, and there is no dispute that Plaintiff agreed to the May 2022 Terms.[7] As further explained below, the September 2022 Terms thus became operative the moment ExpressVPN posted them, and ExpressVPN cannot now resist their application by demanding that Plaintiff prove a separate act of acceptance that its own modification clause made unnecessary.

### 1. Unilateral Modifications Clauses Are Permissible in Illinois and Modifications Made Pursuant to Such Clauses Take Effect Without Separate Acceptance.

As this Court has recently reaffirmed, "whether an agreement to arbitrate has been formed is governed by state-law principles of contract formation." *Domer v. Menard, Inc.*, 116 F.4th 686, 694 (7th Cir. 2024). And it is well settled under Illinois law that parties to a contract may authorize one side to modify the agreement unilaterally. *Cater*, 2026 WL 851264, at *6 ("Illinois permits parties to agree to allow one party to unilaterally modify a contract, including unilateral additions of arbitration provisions."). Modifications made in accordance with such authorizations are binding without any further act of assent by the other party. *Miracle-Pond v. Shutterfly, Inc.*, 19-cv-4722, 2020 WL 2513099, at *6 (N.D. Ill. May 15, 2020) ("[W]hen parties agree in advance to allow unilateral modifications to the terms of their contract, subsequent

[7] Defendant repeatedly muddies the waters by noting that Plaintiff did not concede below that he was bound by any set of terms. *See* Br. at 1, 10, 19–20, 22. This focus ignores the impact of the District Court's finding that Plaintiff *did* assent to the May 2022 Terms—which is not challenged on appeal. The District Court found that Plaintiff had notice of, assented to, and was bound by the May 2022 Terms. A-4–5. Plaintiff's agreement to the September 2022 Terms necessarily flows from that finding as a matter of law because of the unilateral modification clause contained within the earlier agreement. Defendant's emphasis on Plaintiff's mooted position is irrelevant to this appeal.

modifications are binding regardless of whether the other party later 'accepts' the change."); *Southport Bank v. Miles*, 10-cv-8321, 2014 WL 1292452, at *2–3 (N.D. Ill. Mar. 27, 2014) (rejecting argument that unilateral modifications are invalid and holding that, where agreement expressly reserved party's right to modify terms, those modifications were enforceable even if "never assented to" by counterparty). Indeed, though ExpressVPN failed to advise the Court of this, "Illinois law generally allows effectuation of updated contract terms via posting on a website." *Cater*, 2026 WL 851264, at *7.

The *Miracle-Pond* court's analysis of changes to online terms with unilateral modification provisions is directly on point. There, the original terms of use of defendant Shutterfly—an online photo service—included a provision allowing the defendant to revise its terms by posting updates to its website, with continued use of the service constituting acceptance. *Miracle-Pond*, 2020 WL 2513099, at *1. The court found that plaintiff agreed to these terms when she created an account on the Shutterfly website. *Id*. at *4. When the defendant later posted a revised version of the terms adding an arbitration clause, *id*. at *2, the plaintiff argued that, among other things, the modification was unenforceable because she received no notice of and had not assented to the new provision, *id*. at *5.

The *Miracle-Pond* court rejected that argument, explaining that the parties' original agreement (the terms plaintiff agreed to when she created her account) had already resolved the acceptance question: where a service agreement expressly reserves to one party the right to modify the terms unilaterally, subsequent modifications made

pursuant to that reservation are binding on the other party regardless of whether that party separately "accepted" the change later. *Id.* at *6 ("[W]hen parties agree in advance to allow unilateral modifications to the terms of their contract, subsequent modifications are binding regardless of whether the other party later 'accepts' the change." (citing *Southport Bank*, 2014 WL 1292452, at *2–3)). The fact that the Plaintiff in *Miracle-Pond* undertook acts also constituting acceptance under the language of the modification clause does not detract from the court's holding that agreeing to a unilateral modification clause in and of itself constitutes acceptance of future modifications.[8] The modification provision in the original agreement (previously agreed to by the non-modifying party) supplies the necessary consent to the subsequent modification. *Miracle-Pond*, 2020 WL 2513099, at *6 (citing *Kinkel v. Cingular Wireless LLC*, 223 Ill.3d 1, 14 (Ill. 2006)).

*Southport Bank* is similarly instructive. There, a loan agreement expressly provided modifications needed only to be in writing and signed by the "party to be charged" to be effective, reserving to the obligor the unilateral right to modify the agreement. 2014 WL 1292452, at *2. The defendant obligor Goeken Group subsequently executed a modification letter that only it signed. *Id.* After a dispute arose, Goeken argued its own written modification was invalid because neither the obligee nor the obligee's assign had signed it. *Id.* at *2–3. The court rejected this argument: because "the

[8] The court's highlighting of the consumer plaintiff's subsequent use merely reinforces the fairness of holding her to the modification clause; it does not create an assent requirement that allows a corporate defendant to disclaim its own terms.

face of the [original] loan agreement" had already made clear "that the parties intended that Goeken could unilaterally modify the agreement," the assent of the obligee or his assign to that modification was simply "unnecessary." *Id.* at *3.

These same principles dictate the result here, as the following section demonstrates.

### 2. ExpressVPN's May 2022 Terms Authorized Defendant to Make Unilateral Modifications Without Notice That Became Effective Once Posted to Its Website.

Unsurprisingly for adhesive online terms of service, the modification clause in the ExpressVPN's May 2022 Terms explicitly reserves the right of unilateral modification to ExpressVPN. The clause provides that ExpressVPN "may update the Terms from time to time without notice," at which time "these changes take effect," and that the "current version of the Terms is available on the Site." SA-8–9. The clause further places on consumers like Plaintiff "the obligation to review these Terms from time to time in order to stay informed *on current rules and obligations*." SA-9 (emphasis added). Regardless of the clause's additional language setting forth how a consumer can "accept" modifications, *see* SA-9, this is a unilateral modification provision, and, under Illinois law, no further action from a consumer is required, *see, e.g.*, *Miracle-Pond*, 2020 WL 2513099, at *6; *Southport*, 2014 WL 1292452, at *3.

Several features of the May 2022 Terms' modification clause are decisive. First, the right to update the Terms rests entirely with Defendant, and it may exercise its right "without notice." SA-8. Second and third, the modification clause defines the "current version" of ExpressVPN's terms as whatever is posted on the site and thus treats

posting to the website as the operative act: the clause speaks of changes "taking effect" upon being made available on the website, not upon customer acceptance. SA-8–9. Fourth, the clause emphasizes that a customers should review those Terms available on the website in order to keep abreast of "current rules and obligations." SA-9. This language makes plain that the posted version is operative and that users are expected to consult it.[9] None of this language is consistent with Defendant's *post hoc* litigation position: that modifications only apply to new customers until they are accepted piecemeal by the current customer base. SER-112 (defense counsel stating during motion hearing that "the change was not intended to apply to continuing users; it was a change for new users who accepted the [Terms of Service] as they existed at that later point in time, which is not [Plaintiff]").

Under *Miracle-Pond* and *Southport Bank*, the language of the May 2022 Terms' modification provision was sufficient to make a future modification operative upon posting. As in *Miracle-Pond*, Plaintiff agreed to as much via the May 2022 Terms, and that acceptance operated prospectively. It constituted Plaintiff's advance agreement that any modified Terms posted to Defendant's website would govern the parties' relationship. As a result of Defendant's own drafting of and subsequent decision to post new terms (as was its express right), the May 2022 Terms were terminated and replaced

---

[9] Indeed, accepting ExpressVPN's litigation position would mean the opposite: that no posted update is ever operative unless the user affirmatively demonstrates acceptance of it.

by the September 2022 Terms on the day the latter was posted.[10] When Defendant posted the September 2022 Terms, it did precisely what the modification clause authorized, and no further acceptance by Plaintiff was required. *See, e.g.*, *Miracle-Pond*, 2020 WL 2513099, at *6.

The Court should affirm the District Court's holding that "[the September] 2022 Terms of Service superseded the May 2022 Terms of Service and that the parties are no longer subject to a mandatory arbitration provision." A-6.

#### 3. ExpressVPN Cannot Invoke Its Unilateral Modification Right to Post the September 2022 Terms and Then Disclaim Those Terms When They Are Invoked Against It.

Defendant's position leads to an untenable result: ExpressVPN may avail itself of the modification clause it drafted to update its Terms whenever doing so benefits it, while simultaneously shielding itself from those updated Terms whenever they are invoked by another party. That is not how contract law works. Having exercised the unilateral right the modification clause conferred (without any obligation to provide

---

[10] To the extent ExpressVPN argues that Plaintiff's interpretation would render the modification clause's specified methods of acceptance superfluous, it is Defendant's own flawed drafting that makes these provisions to a nullity. This is so for two reasons. First, as explained, no new act of acceptance is in fact necessary under Illinois law because of the way ExpressVPN drafted the clause. And second, the unilateral modification provision makes a consumer's mere use of the "Site" after new terms have been posted "acceptance" of any changes. SA-8–9. Because the clause also allows ExpressVPN to post changes "without notice," SA-8, at the time the consumer visits the website to fulfill his purported obligation to "review these Terms from time to time in order to stay informed on current rules and obligations," he has already accepted any new modification posted "without notice." Moreover, to the extent ExpressVPN's unilateral modification clause creates any ambiguity regarding the need for additional acceptance, the doctrine of *contra proferentem* dictates that such ambiguity must be construed strictly against the drafter: ExpressVPN.

notice to users, as the clause expressly permits), Defendant must stand behind the agreement it drafted and posted.[11] It cannot selectively apply the modification clause's benefits while disavowing its consequences.

*Southport Bank* addresses just such a circumstance: when a party exercises its contractually reserved right of unilateral modification, the modification binds the modifying party just as much as it binds the counterparty. There, it was the obligor's own act (the modification letter) that established the payment due date and ultimately subjected the obligor to liability. *Southport Bank*, 2014 WL 1292452, at *2–3. ExpressVPN stands in analogous position here: it was its own act of posting the September 2022 Terms that made those Terms operative. ExpressVPN cannot undo that consequence simply by pointing to the earlier version and arguing that Plaintiff failed to separately accept the update. By asserting that it met its burden to establish a *prima facie* case for the existence of an arbitration agreement and arguing that Plaintiff failed to rebut that presumption with appropriate evidence, ExpressVPN not only ignores the unilateral modification language it drafted but also perverts the burden-shifting framework for which it advocates. The proponent of an arbitration clause cannot as its prima facie case saddle another party with an obviously terminated arbitration clause to manufacture an evidentiary trap.

The sentences "If you continue to use ExpressVPN's Services, Content, Site, Apps, or Software after these changes take effect, then you agree to the revised Terms"

---

[11] ExpressVPN's argument also cannot be squared with the modification clause's own language. *See supra* § II.A.2. (describing decisive language).

and “Your use of the Content or Services following the changes to these Terms constitutes your acceptance of the changed Terms” in the May 2022 Terms, SA-8–9, do not alter this result. At best, these sentences provide a user with a potential defense were ExpressVPN to invoke the September 2022 Terms against him or her.[12] But a user’s actions are irrelevant to when ExpressVPN became bound by the September 2022 Terms—at the moment it posted them on its website.

In addition to violating the May 2022 Terms, allowing ExpressVPN to require evidence of acceptance of its own modifications would violate the covenant of good faith and fair dealing implied in that original contract. “In Illinois, the implied covenant of good faith and fair dealing is an interpretive tool of contract construction, ensuring only that parties do not try to take advantage of each other in a way that could not have been contemplated at the time the contract was drafted.” *Hartford Accident & Indem. Co. v. Lin*, 97 F.4th 500, 510 (7th Cir. 2024) (quotation omitted). “Disputes involving the exercise of good faith arise when,” as is the case here, “one party is given broad discretion in performing its obligations under the contract.” *McCleary v. Wells Fargo Sec., LLC*, 29 N.E.3d 1087, 1093 (Ill. App. Ct. 2015). The May 2022 Terms gave ExpressVPN broad discretion to make unilateral modifications and “the covenant of good faith and fair dealing requires that the discretion be exercised ‘reasonably and with proper motive, not arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectations of the parties.’” *Id.* No reasonable consumer entering into the May 2022

---

[12] At worst, they represent poor drafting. *See supra* n.10.

Terms would expect ExpressVPN to later disclaim the unilateral modifications it decided to impose.

For the foregoing reasons, the District Court was correct to apply the September 2022 Terms. Those Terms took effect upon Defendant's posting of them, and no separate act of acceptance by Plaintiff was required. Accordingly, the September 2022 Terms, which lack an arbitration clause, govern the parties' dispute and ExpressVPN's motion to compel arbitration was correctly denied.

### B. ExpressVPN Failed to Establish a Valid Arbitration Agreement, but to the Extent Disputes Regarding the Existence of a Valid Agreement Remain, the Case Should Be Remanded for Further Fact Development.

ExpressVPN failed to carry its prima facie burden of establishing a valid arbitration agreement because the evidentiary record it chose to present affirmatively revealed the absence of the agreement it sought to enforce. When ExpressVPN moved to compel arbitration, it submitted only the May 2022 Terms—the version containing the arbitration clause—while neglecting to mention the existence of the September 2022 Terms that had replaced that clause. SER-030–31. It was Plaintiff who alerted the District Court to the September 2022 Terms. *See* SER-053. On reply, ExpressVPN's counsel filed a sworn declaration conceding, through an email to opposing counsel in parallel litigation, that "[t]he arbitration clause was replaced on September 15, 2022." SER-079 ¶ 3; *see also* SER-082. That admission by the party bearing the burden of proof is fatal to ExpressVPN's prima facie case. "A party seeking to compel arbitration under the FAA must show . . . an enforceable written agreement to arbitrate[.]" *Wallrich v. Samsung Elecs. Am., Inc.*, 106 F.4th 609, 617–18 (7th Cir. 2024). ExpressVPN cannot

simultaneously concede that the arbitration clause it relies upon was replaced before this dispute arose while also claiming to have established a valid agreement to arbitrate or even to have made a prima facie case.

This Court's opinion in *Wallrich* reinforces this conclusion. In *Wallrich*, thousands of consumers sought to compel arbitration but failed to submit sufficient evidence linking them individually to an arbitration agreement with the defendant. This Court reversed the order compelling arbitration, holding the consumers had not met their initial burden as the moving party. *Id.* at 618–19. The consumers then argued that the Court should remand to allow them "to present additional evidence." *Id.* at 619. This Court refused, holding that a motion to compel arbitration is "akin to" summary judgment, which "does not allow second chances": "[t]he consumers had the opportunity to present their evidence, and they failed to do so." *Id.* at 619–20. The same principle applies with even greater force here. ExpressVPN, the party that moved to compel, chose to present only the May 2022 Terms while withholding the September 2022 Terms its own counsel later admitted had replaced the arbitration clause. ExpressVPN cannot now benefit from the gaps in the prima facie case it was required to put forward.

In the alternative, to the extent the Court finds that: (1) ExpressVPN met its prima facie burden of establishing a valid arbitration agreement; and (2) posting the September 2022 Terms on ExpressVPN's website did not in and of itself result in supersession of the May 2022 Terms, a genuine dispute of material fact exists as to whether Plaintiff assented to the September 2022 Terms by his failed cancellation

attempts or other conduct referenced in the May 2022 and/or September 2022 Terms. Under these circumstances, the Court should remand for further development of the factual record on that question. *See Kass v. PayPal Inc.*, 75 F.4th 693, 703–04 (7th Cir. 2023) (vacating order compelling arbitration and remanding for trial where disputed issue of fact existed as to whether plaintiff received notice of amended agreement). As discussed above, through its statements in the Reply, ExpressVPN conceded the *fact* of ExpressVPN removing the arbitration clause and the *fact* of Plaintiff using the website and app to unsuccessfully cancel his subscription after ExpressVPN posted the September 2022 Terms, yet nonetheless argued the May 2022 Terms still applied. Because ExpressVPN accepted and relied on those facts and contested only their legal significance (such as the legal effect of Plaintiff's use of the website and app), Plaintiff had no occasion or reason to develop the evidentiary record on that point while the motion remained pending before the district court.

To the extent this Court requires the record to be further developed as to Plaintiff's use of the ExpressVPN platform or other relevant conduct, the Court should remand the case to the District Court so that Plaintiff can present additional evidence. Where the moving party's own evidence and litigation conduct raise—rather than resolve—the central factual question of contract formation, the appropriate remedy is remand, not enforcement of a clause the moving party has itself called into doubt. *See id.*

### C. ExpressVPN's September 2022 Terms Terminated Plaintiff's Arbitration Agreement: No "Clear and Specific Waiver" Was Needed, and the Forum-Selection Clause Is Clear and Specific.

Next, ExpressVPN contends that its May 2022 arbitration clause survived ExpressVPN's wholesale replacement of the May 2022 Terms by the September 2022 Terms because there was no "clear and specific waiver" of that clause. Br. at 22–23. That position is incorrect for at least four independent reasons. First, the presumption of arbitrability on which the "clear and specific waiver" rule is based addresses the scope of a valid arbitration agreement and is thus inapplicable in this case, which concerns whether a valid arbitration agreement exists at all. Second, under Illinois law, the September 2022 Terms superseded the May 2022 Terms in their entirety, extinguishing every provision therein including the arbitration clause. Third, the "clear and specific waiver" requirement ExpressVPN advocates for has no basis in this Circuit; the single out-of-circuit decision ExpressVPN relies on grounded this rule in the inapplicable presumption of arbitrability. Fourth, even if such a requirement existed, the September 2022 Terms satisfy it: they replaced the entire arbitration section, which applied to "all disputes," SA- 17, with an equally all-encompassing forum-selection clause designating a specific court system as the mandatory, exclusive forum for every dispute—the precise opposite of arbitration.

#### 1. The Presumption of Arbitrability, Which Concerns the Scope of an Arbitration Agreement, Does Not Apply Here.

Implicit throughout ExpressVPN's argument is an appeal to the Federal Arbitration Act's presumption in favor of arbitrability. That presumption has no

application here, but to properly address ExpressVPN's "clear and specific waiver" argument, a brief diversion into the presumption is necessary.

The Supreme Court has held that the presumption governs "only where a validly formed and enforceable arbitration agreement is ambiguous about whether it covers the dispute at hand." *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 301 (2010). The presumption addresses uncertainty about the scope of an existing, valid arbitration clause; it has no bearing on disputes about whether a valid arbitration agreement exists. *See Applied Energetics, Inc. v. NewOak Cap. Mkts., LLC*, 645 F.3d 522, 526 (2d Cir. 2011) ("[T]he presumption does not apply to disputes concerning whether an agreement has been made."); *Goldman, Sachs & Co. v. City of Reno*, 747 F.3d 733, 742 (9th Cir. 2014) (presumption "applies only where the *scope* of the agreement is ambiguous as to the dispute at hand" (emphasis original)).[13]

This case concerns the latter type of dispute: whether the September 2022 Terms extinguished the arbitration clause by superseding the May 2022 Terms. In *Granite Rock*, the Supreme Court "preclude[d] application of the FAA's presumption of arbitrability" before it is established that a "validly formed and enforceable arbitration agreement" remains. *Dasher v. RBC Bank (USA)*, 745 F.3d 1111, 1115–16 (11th Cir. 2014) (quoting *Granite Rock*, 561 U.S. at 301). Because no such arbitration agreement remains now due to supersession, the presumption plays no role.

---

[13] The scope "of an arbitration clause concerns how widely it applies, not whether it has been superseded by a subsequent agreement." *Suski v. Coinbase*, 55 F.4th 1227, 1230 (9th Cir. 2022).

### 2. The September 2022 Terms Superseded the May 2022 Terms in Their Entirety.

Likewise embedded in ExpressVPN's argument is the now-rejected notion that arbitration clauses enjoy a special status. But in *Morgan v. Sundance, Inc.*, the Supreme Court held that "a court must hold a party to its arbitration contract just as the court would to any other kind" and that "a court may not devise novel rules to favor arbitration over litigation." 596 U.S. 411, 418 (2022). This Court applied *Morgan* in *Carter v. SP Plus Corp.*, refusing to "place a thumb on the scale in favor of arbitration." 172 F.4th 970, 973 (7th Cir. 2026). That a contractual provision happens to relate to arbitration does not make it any more immune to being removed from the parties' agreement than any other provision. The question of whether the arbitration clause survived is governed by the same Illinois contract principles applicable to any other provision.

Those state law contract principles supply a clear answer. Illinois law provides that "[a] complete, valid, written contract merges and supersedes all prior and contemporaneous negotiations and agreements dealing with the same subject matter." *Courtois v. Millard*, 529 N.E.2d 77, 79 (Ill. App. Ct. 1988). In *Courtois*, the defendant argued that a term from the first agreement survived because the second agreement failed to mention it, *id.* at 721—the same argument ExpressVPN makes here. But the *Courtois* court rejected that argument for reasons that apply with equal force here:

> This contention fails because the first and second contracts are distinguishable from each other and contain inconsistent terms. Only one of the two contracts could be valid. The execution of the second contract terminated the legal effect

> of the first contract, and the defendants' contention on this point fails.

*Id.* Thus, when two written contracts "are distinguishable from each other and contain inconsistent terms," the execution of the later contract "terminated the legal effect of the first contract." *Id.* at 721. This is exactly what happened when ExpressVPN replaced the May 2022 Terms with the September 2022 Terms, both of which share identical subject matter: each defines the same terms, such as "Services," "Site," "Apps," "Software," "Content," and "Subscriber" and each governs the same consumer VPN subscription relationship. Moreover, the two versions contain materially inconsistent provisions. For example:

(1) Most consequentially here, ExpressVPN completely changed the dispute-resolution regime, replacing a two-page mandatory arbitration provision in the May 2022 Terms with a single paragraph forum-selection provision in the September 2022 Terms providing that courts in Tortola, BVI have exclusive jurisdiction over all disputes arising out of or relating to the agreement. *Compare* SA-17–19 ¶ 15 *with* SA-80 ¶ 17.

(2) The September 2022 Terms introduced sections on ExpressVPN Keys and Chargebacks absent from the May 2022 Terms. *Compare* SA-76 ¶ 5 ("ExpressVPN Keys" paragraph following the "Subscriptions" paragraph), SA-80 ("Chargebacks" paragraph following "Indemnification" paragraph) *with* SA-9–10, 17 (no such paragraphs).

(3) The September 2022 Terms eliminated the "update of the Site" as a permissible method of notifying subscribers of core changes to the Terms. *Compare* SA-8–9 ¶ 2 *with* SA-75 ¶ 2.

(4) The September 2022 Terms eliminated the requirement of "prior written consent" for contract assignment in the event of an acquisition. *Compare* SA-19 ¶ 16 *with* SA-80–81 ¶ 18.

"The inconsistencies between the two contracts evinces the conclusion that the two parties intended for the second contract to control their agreement and to supersede the first contract." *Courtois*, 174 Ill. App. 3d at 721.

This principle is also illustrated by *Dasher*, in which the Eleventh Circuit reached the same result when analyzing whether a contract containing an arbitration provision was superseded by another contract *without* one. In *Dasher*, the plaintiff alleged that defendant bank RBC charged an excessive fee in breach of the parties' account agreement. 745 F.3d at 1113. At the time, the relationship between the parties was governed by a 2008 agreement ("RBC Agreement") with an arbitration clause broad enough to cover the dispute. *Id* at 1113–14. In 2012, before acquiring RBC, PNC issued an account agreement that governed its relationship with the plaintiff ("PNC Agreement"), which he accepted. *Id*. "Unlike the RBC Agreement, the PNC Agreement did not contain an arbitration clause—in fact, it did not mention arbitration at all." *Id*.

RBC argued that "because arbitration clauses can only be waived by clear and explicit language," they "cannot be waived by silence." *Id* at 1118–19. The *Dasher* court's rejection of RBC's argument applies with equal force here:

> The obvious response is that this case does not involve *waiver* of an arbitration provision at all; rather, it involves superseding the entire agreement containing an arbitration provision and replacing that provision with silence. These are two very different situations: waiver situations involve a still-valid underlying prior agreement, while the situation here involves an entirely invalid underlying prior agreement. In the waiver context, the agreements may create ambiguity with regard to arbitration, but here, it is clear that all provisions in the prior agreement are eliminated under state law, including the arbitration provision, and nothing in

> the new agreement establishes the right to compel arbitration anew.

*Id.* at 1119 (emphasis original). Likewise, under Illinois law, ExpressVPN's September 2022 Terms superseded the May 2022 Terms and "this case does not involve waiver of an arbitration provision at all." *Id.*

ExpressVPN may argue that the May 2022 Terms' arbitration clause could not have been superseded by the September 2022 Terms because those later Terms do not contain a merger clause. But as the *Dasher* court made clear, the presence or absence of a merger clause is not dispositive of supersession. Instead, the *Dasher* court explained that supersession turns on "the basic legal principle that 'contracting parties are free to revoke an earlier agreement to arbitrate by executing a subsequent agreement the terms of which plainly preclude arbitration.'" *Dasher*, 745 F.3d at 1120 (citing *Applied Energetics*, 645 F.3d at 525). Thus, having determined under state-law contract principles that the PNC Agreement—which the opinion does not indicate contained a merger clause—entirely superseded the RBC Agreement, the *Dasher* court concluded that the RBC Agreement's arbitration clause was rendered "ineffective, even if the superseding agreement is silent on arbitration." *Id.* at 1122. As discussed above, Illinois contract principles governing the supersession of agreements by subsequent terms require the same result here, the absence of a merger clause notwithstanding.

#### 3. The Seventh Circuit Has Not Adopted a "Clear and Specific" Waiver Rule Regarding the Supersession of Arbitration Clauses.

ExpressVPN's sole Seventh Circuit authority for the "clear and specific waiver" argument is *United Steel v. TriMas Corp.*, 531 F.3d 531, 538 (7th Cir. 2008). *See* Br. at 23–

24. But *TriMas* involved fundamentally different facts and is easily distinguishable. In that case, the original written neutrality agreement between United Steel labor union and TriMas—and its broad arbitration clause—remained fully operative throughout the parties' dispute. *Id* at 533. Under the agreement, TriMas was required to cooperate with organizing efforts at its facilities. *Id*. A dispute later arose concerning organizing at one of TriMas's plants. *Id*. TriMas resisted arbitration, arguing that an oral side agreement—not a superseding agreement—had excluded the plant in question from arbitration. *Id*. The Seventh Circuit affirmed the order compelling arbitration, holding that evidence of oral modification as to the ***scope*** of the underlying neutrality agreement was insufficient to avoid arbitration because the modification was not "directed to the arbitration clause itself." *Id.* at 538 (quotation omitted). *TriMas* has nothing to say about the circumstance here, in which the entire prior contract—arbitration clause included—has been superseded by a subsequent written agreement under state law. The Seventh Circuit has never imposed a "clear and specific waiver" requirement in a supersession case.

#### a. ExpressVPN's Out-of-Circuit "Clear and Specific Waiver" Rule is Derived from the Inapplicable Presumption of Arbitrability.

For the "clear and specific waiver" standard, ExpressVPN relies principally on *Edwards v. TikTok, Inc.*, 804 F. Supp. 3d 1049 (C.D. Cal. 2025)—an out-of-circuit district court decision. But *Edwards* is both factually and legally distinguishable. It cannot carry the weight ExpressVPN places on it.

On the facts, the prior terms in *Edwards* contained an express survivability clause stating that the arbitration provision would "survive any termination of these terms."

*Id.* at 1053. Because the arbitration clause survived by its own express terms, the prior agreement in *Edwards* was not entirely superseded in the manner relevant here. The May 2022 Terms contain no comparable survivability language.

On the law, the Central District of California judge in *Edwards* cited a single authority of the "clear and specific waiver" standard ExpressVPN now advocates for: *Homestake Lead Co. of Missouri v. Doe Run Resources Corp.*, 282 F. Supp. 2d 1131 (N.D. Cal. 2003). This twenty-year-old, out-of-circuit district court decision expressly grounded its "clear and specific waiver" rule in the FAA's presumption in favor of arbitrability, explaining that any lesser standard would "run[] contrary to the FAA's presumption in favor of arbitrability." *Id.* at 1141–42.[14] As set forth above, the presumption of arbitrability—and any "clear and specific waiver" rule needed to overcome it—has no application in this case; it governs an arbitration agreement's scope, not its existence.

Moreover, and as noted above, imposing a heightened "clear and specific" standard for arbitration clauses but not for other contractual provisions directly conflicts with the Supreme Court's holding in *Morgan* that courts "may not devise novel rules to favor arbitration over litigation." 596 U.S. at 418. The FAA "is about treating arbitration contracts like all others, not about fostering arbitration." *Id.* at 419. A rule requiring parties to use special language to extinguish an arbitration clause—while

[14] In turn, *Homestake Lead* traced the "clear and specific waiver" rule to *WorldCrisa Corp. v. Armstrong*, 129 F.3d 71 (2d Cir. 1997). *See Homestake Lead*, 282 F. Supp. 2d at 1142. But *WorldCrisa* likewise found the rule implicit in the presumption of arbitrability. *See WorldCrisa*, 129 F.3d at 74–75.

imposing no analogous requirement for any other term—is precisely the kind of arbitration-favoring procedural rule that *Morgan* forbids.

b. Courts Have Expressly Rejected the "Clear and Specific Waiver" Requirement ExpressVPN Seeks to Impose Here and ExpressVPN's Contrary Authority Is Inapplicable.

Multiple courts of appeals have held that a later agreement need not expressly revoke an earlier arbitration clause for it to nonetheless be terminated. While the Ninth Circuit acknowledged in *Goldman, Sachs & Co. v. City of Reno* that an express waiver clause in the later agreement would make the analysis easier, it unequivocally held that "we know of no requirement that [the parties] do so." 747 F.3d at 744. In *Suski*, the same court confirmed that even absent "language specifically revoking the parties' arbitration agreement," a forum-selection clause in a later agreement "evince[s] the parties' intent not to be governed by the [earlier] arbitration clause." 55 F.4th at 1231, *aff'd*, *Coinbase, Inc. v. Suski*, 602 U.S. 143 (2024).

The Eleventh Circuit's reasoning in *Dasher* is particularly instructive. That court drew a principled distinction between the kind of waiver ExpressVPN demands here—which presupposes "a still-valid underlying prior agreement"—and supersession, in which the prior agreement is "entirely invalid." 745 F.3d at 1119. When an earlier contract has been wholly extinguished as is the case here, no valid contract containing an arbitration provision exists, so waiver is neither required nor possible. *See id.*

Indeed, the financial institution case on which ExpressVPN relies for its desired waiver requirement, *Patten Secs. Corp. v. Diamond Greyhound & Genetics, Inc.*, 819 F.2d 400 (3d Cir. 1987), Br. at 23, and others like it illustrate this distinction rather than

support ExpressVPN's position. In these cases, the courts were faced with: (1) the arbitration obligation arising from FINRA (or its predecessor NASD) membership rules—a regulatory framework that independently binds member firms by virtue of their membership, entirely apart from any particular contract with a customer; and (2) subsequent contracts between those member firms and their customers that had mandatory forum-selection clauses. The question in all these cases was whether the member firm's FINRA rule-based arbitration obligation was still enforceable after the firm entered into agreements with broad and exclusive forum-selection clauses.

In all these cases, the arbitration obligation at issue derived from FINRA's regulatory rules existing independently of the contracts. Subsequent written agreements adopting forum selection clauses in these cases that said nothing about FINRA rule-based arbitration created genuine ambiguity about whether the parties intended to displace it and the Circuit Courts disagreed whether the forum-selection clause alone was sufficient to do so. In *Patten* and *UBS Fin. Servs., Inc. v. Carilion Clinic*, 706 F.3d 319 (4th Cir. 2013), the Third and Fourth Circuits concluded that the member firms were still required to arbitrate; that is, the forum selection clauses in the agreements did not supersede the independently existing NASD or FINRA arbitration obligation. But in *Goldman, Sachs & Co. v. City of Reno*, 747 F.3d 733, 742 (9th Cir. 2014) and *Goldman, Sachs & Co. v. Golden Empire Schs. Fin. Auth.*, 764 F.3d 210 (2d Cir. 2014), the Ninth and the Second Circuits held that the parties' agreements with forum-selection clauses did supersede arbitration obligation required by FINRA's rules.

That dynamic—genuine ambiguity springing from the co-existence of two separate agreements—is wholly different from the situation here, where the arbitration agreement arose from the May 2022 Terms and had no independent existence outside the contract. When ExpressVPN replaced the May 2022 Terms with the September 2022 Terms, the obligation to arbitrate was extinguished as a matter of state contract law. There is no separate, independent basis for arbitration (like the FINRA rules) that the superseding September 2022 Terms could have left intact.

But even if the Court were to accept ExpressVPN's framing, the Second and Ninth Circuits in the respective *Goldman Sachs* cases—both decided after *Patten* and *Carilion* – used more persuasive reasoning and characterized the rationale in the Fourth Circuit's *Carilion* opinion as "little more than a linguistic trick." *Golden Empire*, 764 F.3d at 217. So even if the Court treats the May 2022 Terms as still having some force after ExpressVPN posted the September 2022 Terms, the weight of persuasive circuit authority supports the conclusion that the forum-selection clause in the September 2022 Terms was sufficient to supersede the May 2022 Terms' arbitration clause without any express revocation language.

**4. Even Assuming a "Clear and Specific Waiver" of the May 2022 Terms' Arbitration Agreement Were Required, the September 2022 Terms' Forum-Selection Clause Does Just That.**

Even accepting ExpressVPN's premise, the District Court should nonetheless be affirmed. The September 2022 Terms that ExpressVPN drafted clearly and specifically communicated that the arbitration obligation was now ended. The relevant inquiry is not whether the September 2022 Terms used the word "arbitration" or contained a

clause terminating the prior arbitration agreement. It is whether, read as a whole, the September 2022 Terms gave adequate notice that the prior dispute resolution mechanism (arbitration) had been displaced.

The answer is yes. ExpressVPN excised its two-page arbitration section from the May 2022 Terms and replaced it, in a section titled "Dispute Resolution," with a clause providing that "all disputes arising out of or relating to this Agreement or the use of the Services shall be finally settled by the applicable Courts located in Tortola, British Virgin Islands (BVI)." SA-80. The scope of the two provisions is identical: each applies to "all disputes" arising out of the agreement and services. *Compare id. with* SA-17. The mechanism designated for resolving those disputes is categorically and irreconcilably opposed—courts in one agreement, arbitrators in the other. "Both provisions are all-inclusive, both are mandatory, and neither admits the possibility of the other." *Applied Energetics*, 645 F.3d at 525. To require something more, such a specific recitation of a magic word like "arbitration" or "waiver," elevates form over substance and has no analogue anywhere in ordinary contract law, which is precisely the kind of arbitration-specific contract rule that *Morgan* forbids.

Moreover, ExpressVPN's argument that the forum-selection clause in the September 2022 Terms should be "harmonized" with the arbitration clause in the May 2022 Terms is logically impossible. The cases ExpressVPN cites for harmonization each involved an arbitration clause that remained valid and operative in the same or a concurrently effective agreement: *Hanc & Brubaker Holdings v. NXT LVL Servs., LLC*, 22-cv-1526, 2023 WL 1069854 (N.D. Ill. Jan. 27, 2023) (arbitration and forum selection

clauses in the same agreement), *ValuePart, Inc. v. Farquhar*, 14-cv-3004, 2014 WL 4923179 (N.D. Ill. Sept. 29, 2014) (same), and *ChampionsWorld, LLC v. U.S. Soccer Fed'n, Inc.*, 487 F. Supp. 2d 980, 988–89 (N.D. Ill. 2007) (similar to the FINRA cases discussed *supra* § II.C.3.b, with arbitration in FIFA regulations and a forum-selection clause in the parties' agreement). Harmonization of arbitration and forum-selection clauses can only occur when the arbitration clause is still enforceable. Here, the May 2022 Terms were entirely superseded; no valid arbitration clause remains and there is nothing to harmonize. And even if the May 2022 Terms' arbitration agreement somehow retained some residual force, harmonization would still be impossible. Two all-inclusive, mandatory provisions prescribing opposite and irreconcilable fora cannot coexist and the latter controls. *Applied Energetics*, 645 F.3d at 525.

This Court should reject ExpressVPN's waiver argument and affirm the District Court.

## III. EXPRESSVPN'S THIRD AND FINAL APPELLATE ISSUE ALSO FAILS BECAUSE DELEGATION IS NOT APPROPRIATE WHERE THE ARBITRATION AGREEMENT HAS BEEN TERMINATED.

ExpressVPN's final argument is the only one it did not waive by failing to raise it below. According to ExpressVPN, whether the September 2022 Terms supersede the May 2022 Terms is a question for the arbitrator, not the courts. Br. at 16, 26–29. This argument rests entirely on the premise that if a delegation clause once existed in an arbitration agreement, all subsequent questions—including whether a later agreement eliminated that delegation clause—must be resolved by the arbitrator. The Supreme Court rejected this precise argument in *Coinbase, Inc. v. Suski*, 602 U.S. 143 (2024).

In *Coinbase*, the parties' first agreement (the "User Agreement") contained an arbitration provision with a delegation clause, while a second, concurrent agreement (the "Official Rules") contained a forum-selection clause designating California courts. *Id.* at 145. The Supreme Court framed the issue as follows:

> Coinbase says the User Agreement's delegation clause controls. Respondents counter that the Official Rules' forum selection clause superseded that agreement. If Coinbase is right that the User Agreement's delegation clause was meant to govern all agreements moving forward, then the parties agreed to arbitrate all subsequent arbitrability disputes. If respondents are correct that the Official Rules' forum selection clause superseded the User Agreement's delegation clause, then the parties meant to send sweepstakes disputes—including those over arbitrability—to California courts.

*Id.* at 149–50 (2024). The Court resolved the question posed by the parties' discordant positions as follows:

> When we home in on the conflict between the delegation clause in the first contract and forum selection clause in the second, the question is whether the parties agreed to send the given dispute to arbitration—and, per usual, *that* question must be answered by a court.

*Id.* at 150 (emphasis original). The same principle applies here.

*Coinbase* is particularly instructive because the arbitration proponent there had a stronger case for delegation than ExpressVPN has here. In *Coinbase*, both agreements coexisted simultaneously—the earlier User Agreement had not been terminated by the Official Rules. *Id.* at 147. Even so, the Court held that a court, not an arbitrator, must determine which agreement controls. Here, the later agreement—the September 2022 Terms—entirely supplanted the earlier one, governing the same subscription service

between the same parties. That sequential, superseding relationship strengthens, not weakens, the case for judicial resolution. If a concurrent second agreement requires a court to determine which contract governs the question of arbitrability stemming from the still-valid arbitration provision in the first agreement, a subsequent agreement that purports to govern all conduct between the same parties over the same subject matter warrants at least the same judicial scrutiny. The *Coinbase* Court's dispositive conclusion bears repeating: "We conclude that a court, not an arbitrator, must decide whether the parties' first agreement was superseded by their second." *Id.* at 152.

ExpressVPN warns that permitting courts to examine subsequent agreements would allow parties to "circumvent a valid delegation clause simply by asserting that the delegating contract was later amended." Br. at 29. The *Coinbase* Court considered and rejected that very concern, stating that it did not believe its ruling would "invite chaos by facilitating challenges to delegation clauses." *Coinbase*, 602 U.S. at 152. If anything, the risk runs in the opposite direction. ExpressVPN's proposed rule—that a delegation clause in an earlier agreement permanently insulates itself and its arbitration provision from judicial review by routing all subsequent questions to an arbitrator—would itself "impermissibly elevate a delegation provision over other forms of contract," precisely what *Coinbase* forbids. *Id.* at 152 (cleaned up).

Indeed, under ExpressVPN's logic, a consumer who once agreed to arbitration would be bound to arbitration in the first instance forever, regardless of what the parties later agreed. That is exactly what ExpressVPN argues here: that a corporate defendant who drafted an arbitration clause a consumer once accepted may use that

agreement to compel that consumer into arbitration indefinitely—even after unilaterally drafting and posting multiple new versions of the terms that supersede any arbitration agreement, using the very modification rights it reserved for itself. That result cannot be reconciled with the FAA's foundational principle that "arbitration agreements are simply contracts" governed by ordinary contract law. *Id.* at 148.

## IV. THE *MILLAR* COURT DID NOT DECIDE THE ISSUE PRESENTED HERE.

Finally, ExpressVPN erroneously argues that the District Court should have parroted the outcome of ExpressVPN's motion to compel in *Millar v. Express Techs. Ltd.*, 25-cv-1273, 2025 WL 4061252 (C.D. Cal. Nov. 25, 2025). In *Millar*, the court compelled arbitration after finding that the plaintiff had agreed to the May 2022 Terms upon signup. *Id.* at *9–11. ExpressVPN mischaracterizes *Millar* as holding that "the consequence of the terms of use update" in September 2022 is an issue for the arbitrator to decide. Br. at 26. Wrong. While ExpressVPN uses *Millar* to support its first two appellate arguments—both grounded in the theory that the May 2022 Terms control, *see* Br. at 25–26—in reality, *Millar* relates to the delegation question raised in ExpressVPN's third appellate issue, Br. at 26–29. Either way, *Millar* does not aid ExpressVPN. The *Millar* court never analyzed whether the September 2022 Terms replaced the May 2022 Terms; instead, it addressed the issue strictly as the plaintiff framed it: a question of ExpressVPN's waiver of its right to arbitration by its subsequent conduct, not supersession of the arbitration agreement.

As explained above, whether a valid arbitration agreement exists is a threshold question for the court. Rather than pressing this point, the plaintiff in *Millar* argued that

ExpressVPN had waived its right to compel arbitration. *See* SER-073 (ExpressVPN's Reply Brief, acknowledging to the District Court that the *Millar* plaintiff's argument was "that ExpressVPN waived its right to compel arbitration by purportedly binding subscribers through their continued use of the updated TOS"). The *Millar* plaintiff's opposition brief focused squarely on this theory. *See* SER-117–19 (*Millar* plaintiff's opposition brief, arguing that "ExpressVPN waived any right to compel arbitration").

ExpressVPN's insistence that the *Millar* waiver argument is "nearly identical" to the supersession argument presented here, *see* SER-073, is legally incorrect. An argument that a party *waived* arbitration presupposes the continued existence of a valid arbitration agreement. *See supra* § II.C.1.–3.; *see also* SER-117 (*Millar* plaintiff's opposition, setting forth waiver standard: (1) a party's knowledge of arbitration right; and (2) actions inconsistent with it). Although the *Millar* plaintiff noted that ExpressVPN used its modification clause to post the September 2022 Terms, he ultimately couched his entire argument—including the legal standard he asked the court to apply—in terms of waiver.

Unsurprisingly, the *Millar* court evaluated the argument exactly as framed. *See Millar*, 2025 WL 4061252, at *11 ("Plaintiffs next argue the court should not compel arbitration as to Millar because . . . ExpressVPN has waived its ability to compel arbitration."). Far from resolving or analyzing the supersession issues raised here, the *Millar* court held only that the *waiver* question was delegated to the arbitrator. *Id.* (finding waiver to be an "arbitrability" dispute delegated to the arbitrator).

Here, Plaintiff does not argue waiver. Instead, Plaintiff contends that under ExpressVPN's own modification clause, the later terms replaced the May 2022 Terms and eliminated the arbitration clause entirely. The District Court correctly resolved this contract-formation dispute in Plaintiff's favor. In *Coinbase, Inc. v. Suski*, a unanimous Supreme Court ruled unequivocally that courts—not arbitrators—must resolve these exact questions. 602 U.S. at 152 ("We conclude that a court, not an arbitrator, must decide whether the parties' first agreement is superseded by their second."). Consequently, the *Millar* decision and the District Court's ruling below are entirely consistent: while waiver may be delegated to an arbitrator, before "the delegation provision . . . can be enforced, a court needs to decide what the parties have agreed to—i.e., which contract controls." *Id.* at 148.

This Court is not bound by the decision of a judge in the Central District of California, and neither was the District Court judge in this case. But despite ExpressVPN's wishes, the *Millar* opinion is not even persuasive authority on the issues raised by this appeal because of the critical differences in the arguments presented. The District Court should be affirmed.

**CONCLUSION**

For the foregoing reasons, the decision of the District Court should be affirmed.

Dated: June 10, 2026

Respectfully submitted,

By: /s/ Jessica L. Hunter

**WITTELS MCINTURFF PALIKOVIC**
Jessica L. Hunter
305 Broadway, 7th Floor
New York, New York 10007
Telephone: (914) 775-8862
jlh@wittelslaw.com

Counsel for Plaintiff-Appellee, Charles Greenwood

**CERTIFICATE OF COMPLIANCE WITH FRAP RULE 32(A)(7), FRAP RULE 32(G), FRAP RULE 32(C)**

I hereby certify that this brief complies with the requirements of Federal Rule of Appellate Procedure 32(a), including the type-volume limit of Fed. R. App. P. 32(a)(7)(B) and Seventh Circuit Rule 32(c) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this brief contains 13,908 words. This brief further complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and Seventh Circuit R. 32(b) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it was prepared using 12-point Book Antiqua Font, a proportionally spaced font, in the body of the brief, and 11-point in footnotes.

/s/ Jessica L. Hunter
Jessica L. Hunter

**PROOF OF SERVICE**

I, Jessica L. Hunter, hereby certify that on June 10, 2026, I caused the foregoing Brief and Appendix for Plaintiff-Appellee to be electronically filed with the Clerk of Court for the United States Court of Appeals for the Seventh Circuit using the CM/ECF system, which constitutes service on all counsel of record, registered, filing users, pursuant to Federal Rule of Appellate Procedure 25(c)(2) and Circuit Rule 25(a).

/s/ Jessica L. Hunter
Jessica L. Hunter

Counsel for Plaintiff-Appellee
Charles Greenwood